FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

01 JUN 20 AM 8:

U.S. ........ ST. CO.
N.D OF ALABAM

| THOMAS E. SEXTON, et al., | ) |
| | ) |
| Plaintiffs | ) |
| | ) |
| vs. | ) CASE NO. CV99-HGD-2116-NE |
| | ) |
| BOC GROUP, INC., | ) |
| | ) |
| Defendant | ) |

ENTERED
JUN 20 2001

## MEMORANDUM OPINION

The above-entitled civil action is before the undersigned United States Magistrate Judge upon the consent of the parties in accordance with the provisions of 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73. This action was filed on or about July 12, 1999, in the Circuit Court for Madison County, Alabama, and removed to federal court by defendant based on 28 U.S.C. §§ 1332 and 1367 on August 13, 1999.

Plaintiffs, Thomas Sexton and Carolyn Sexton, are residents of Madison County, Alabama. Plaintiff Sexton Welding Supply Company, Inc. (Sexton Welding), is, and was at the time of the institution of this suit, a corporation organized and existing under the laws of the state of Alabama with offices in north Alabama and middle Tennessee. Defendant, The BOC Group, Inc. (BOC), was, at the time of the institution of this suit, a corporation organized and existing under the laws

39.

of the State of Delaware with its principal place of business in New Jersey. Both parties have filed motions for summary judgment.

## FACTUAL BACKGROUND

Plaintiff, Tom Sexton, is the primary shareholder of Sexton Welding Company, owning 99 out of 100 shares of its stock. His wife, Carolyn, owns the remaining share. Sexton Welding sells gases and welding supplies and rents out gas cylinders through five locations in Alabama and Tennessee. The business is operated by Tom Sexton. Carolyn does not play an active role in the day-to-day operations of the company.

Prior to 1998, Tom Sexton had entered into negotiations with several different companies regarding the possible sale of his company, including AirGas, Holox, Holston Gases, and BOC. In 1996, Sexton rejected an offer by BOC to purchase his company.

The current controversy began to develop during the summer of 1998 when BOC and Tom Sexton again began to have discussions about the possibility of BOC acquiring Sexton Welding. In September 1998, BOC prepared a document for Sexton titled "Sexton Welding Supply Company, Inc. Revised Stock Purchase Offer" and dated September 28, 1998. [Doc. #21, Defendant's Exhibit 7]. This document lists, *inter alia*, values for certain items BOC was offering to purchase from Sexton such as cylinders used by the business, working capital and goodwill. A copy of this document submitted by BOC also reflects handwritten notes which purportedly were added to the document during negotiations between the parties on October 7, 1998, reflecting certain agreed changes in amounts to be paid to Sexton which differed from

2

BOC's initial offer. In addition, the top of this document contains a handwritten notation stating: "$300,000 to be paid at the time of the letter of intent signing along with Note Receivable from Tom in event he pulls out of deal."

Under the heading "Purchase of Other Assets, including Goodwill," the typewritten amount of $979,250 is scratched through and the amount of $1,779,250 is handwritten above it. To the left side of this is the handwritten statement: "$200,000 of which is contingent on maintaining revenue." At the bottom of the document is a handwritten notation that "$200,000 of Goodwill is contingent upon maintaining revenue of existing customer(s) for 1 year at levels equal to or above 1 year prior to closing." It also contains notations reflecting the following:

| 100% | $200,000 |
|------|----------|
| 99%  | $160,000 |
| 98%  | $120,000 |
| 97%  | $ 80,000 |
| 96%  | $ 40,000 |

The document also contains changes in the amounts to be paid for other items such as a non-competition agreement (reducing the amount to be paid from $1,000,000 to $500,000), and a corrected total amount to be paid for the company. [Id.].

These changes were negotiated on October 7, 1998, when Tom Sexton met with BOC representatives Pete Cochran and Robert Van Kirk at a restaurant located at the Huntsville Airport. At the end of these negotiations, Tom Sexton shook hands with Cochran and Van Kirk and stated, "Boys, you've bought yourselves a hell of a good company."

Subsequently, the handwritten changes to the various dollar amounts referenced above were incorporated into a document titled "Sexton Welding Company, Inc. Final Stock Purchase

3

Offer" dated October 7, 1998. This was followed by a Letter of Intent dated October 9, 1998, and sent by BOC to Sexton. The handwritten notation from the September 28, 1998, document, reflecting that there was to be a payment of $300,000 made to Sexton upon the signing of the Letter of Intent, which was to be restructured as a loan in the event an Asset Purchase Agreement was not reached between the parties, was included in a Letter of Intent submitted to Sexton by BOC dated October 9, 1998. This Letter of Intent also incorporated the language from the handwritten notations on the September 28, 1998, document regarding the payment to Sexton of up to $200,000, contingent upon the level at which sales revenues were maintained after the sale to BOC was completed, and the language regarding the payment to Sexton of $500,000 for a non-compete agreement. However, Sexton did not sign this October 9 Letter of Intent.

Thereafter, various other minor alterations were made to the October 9, 1998, document and incorporated into a Letter of Intent dated October 27, 1998, which was signed by Sexton and representatives of BOC. This final Letter of Intent still incorporated the handwritten amendments made to the September 28, 1998, document referenced above, which had been negotiated on October 7, 1998, and had been included in the October 9, 1998, Letter of Intent. The October 27, 1998, Letter of Intent states in pertinent part:

> This letter will summarize the basis of a proposed agreement for the purchase by the BOC Group, Inc. ("BOC") from Tom and Carolyn Sexton ("Selling Shareholders") of all the outstanding capital shares ("Shares") of Sexton Welding Supply Co., Inc. ("Sexton").
>
> * * *
>
> In consideration of the sale and transfer of all outstanding Shares of Sexton, BOC will pay to the Selling Shareholders the sum of

4

$3,857,651.00 subject to the contingencies and adjustments as outlined below.

\* \* \*

(i) Included in the assets of Sexton are 10,307 cylinders currently owned by Sexton with a value of $1,202,750. Prior to the closing Date, Sexton and BOC will conduct a verification audit of the industrial gas and liquid cylinders. The purchase price will be subject to adjustments for cylinder shortages, assuming a minimum quantity of 10,307.

\* \* \*

(iii) In addition to any adjustment for cylinder shortages, adjustments to the purchase price will be made based on the changes in the working capital (inventory, accounts receivable and trade payables), operating assets and other debt exclusive of goodwill of the business from the December 31, 1997 balance sheet as reflected in a closing date balance sheet prepared jointly by the parties.

(iv) As part of the preparation of such closing date balance sheet, Sexton and BOC shall conduct a physical count and inspection of resale inventories of the business as of the Closing Date and shall in good faith determine which items, if any, are to be excluded from the closing balance sheet because they are obsolete, shopworn or otherwise unsalable.

\* \* \*

Five (5) business days after signing of the Letter of Intent, BOC will make a $300,000 payment to Sexton structured as an interest free loan for 60 days. After 60 days the loan will accrue interest at 6%. If an Asset Purchase Agreement is concluded on the sale of Sexton to BOC, the $300,000 plus any accrued interest will be applied against the closing payment amount at closing. If an agreement is not reached, the loan becomes due in full in 6 months from the date of the loan or upon execution of an agreement whereby substantially all the assets or stock of Sexton are transferred to a third party whichever is earlier.

\* \* \*

> This letter is an expression only of the present intentions of BOC, Sexton, and the Selling Shareholders and, except for paragraph 7 [Exclusive Negotiations], which is intended to be binding, imposes no obligation whatsoever upon any party. Consummation of the transaction will be subject to satisfactory conclusion of due diligence review by BOC, and execution and delivery of a definitive purchase agreement by and among Sexton, Selling Shareholders and BOC in form and substance satisfactory to the parties and their respective counsel. This letter does not constitute a binding agreement to consummate the Transaction referred to herein nor does it constitute an agreement to enter into a final agreement with respect hereto.

[Doc. #21, Defendant's Exhibit 1].

In November 1998, BOC began its due diligence investigation. This included a review of Sexton's sales, financial records, accounts receivable, and invoices. A cylinder audit also was conducted by BOC to determine for how many rental cylinders Sexton Welding could account. In addition, after Sexton Welding's 1998 year-end inventory of hard goods (not including the gas cylinder count) was conducted, that inventory and other proprietary information were provided to BOC.

In January 1999, in anticipation of the sale of Sexton Welding to BOC, Tom Sexton dissolved his employee profit sharing plan. During this same time period, he borrowed $700,000 in order to purchase real estate, a Winnebago, and a pick-up truck owned by Sexton Welding which BOC was not going to buy when it purchased the company. He then leased the real property and pick-up truck back to Sexton Welding.

6

Sexton Welding also sold sheets of steel through its Tullahoma, Tennessee, store. This store was run by Steve Hasty. When Hasty learned that BOC was going to do away with the steel business if it purchased Sexton Welding, Hasty decided to start his own business. In March 1999, when the deal subsequently failed to go through, Mr. Hasty was still working for Sexton Welding. Nevertheless, he went ahead with his plan to leave Sexton Welding and start his own business. Sexton kept the inventory present at the time Hasty left the company and is selling it off. After the purchase failed to materialize, Tom Sexton did not attempt to replace Hasty or continue the steel business.

Another employee, Chris Cason, quit his job at Sexton Welding because he did not like the compensation package offered by BOC. He went to work for a competitor at a higher salary. Sexton also lost two drivers, both of whom since have been replaced by other drivers.

At the conclusion of its due diligence investigation, BOC submitted a document titled "Due Diligence Summary" and dated February 12, 1999, to plaintiffs. In that report, BOC asserted that it uncovered a number of shortcomings in Sexton Welding's financial status. It claimed that the original offer was made for the business based on revenue and gross margin projections using June 1998 year-to-date and 1997 figures; however, it asserted that its review reflected that actual 1998 year-end results were below the projections used to make the original offer. In particular, it asserted that revenue was $100,000 less than the projections, and the gross margin percentage was 1% less than projected. BOC determined that this shortfall necessitated a $401,000 reduction in its offer.

7

BOC also expressed concern over its alleged discovery that Sexton had accounts receivable in excess of $100,000 more than 90 days past due, an inventory approximately $60,000 in value less than represented by Sexton, and approximately $50,000 of potentially obsolete or unsalable inventory. According to BOC, these shortcomings reduced the price it was willing to pay by another $210,000. In addition, BOC claimed that its audit of Sexton's gas cylinders indicated that Sexton Welding owned 6,700 cylinders, rather than the 10,307 stated in the Letter of Intent and as allegedly represented to BOC. BOC further reduced its offer by $764,592 as a result of this alleged shortfall.

In total, BOC made price adjustments and reduced its offer for the purchase of Sexton Welding by $1,376,092. Sexton disputed BOC's findings, and the parties never reached agreement as to what adjustments and valuations were appropriate and correct. On March 19, 1999, BOC advised Tom Sexton that BOC had decided not to go through with the purchase of Sexton Welding.

Sexton Welding asserts that the shortcomings stated by BOC either did not exist, were inaccurate, or were not the true reason for its refusal to carry through on its offer to purchase Sexton Welding. As a result, plaintiffs claim BOC breached a binding agreement to purchase Sexton Welding and that they suffered the following damages:

       (a) Proprietary information was disclosed.

       (b) Proprietary information outside the agreement was disclosed.

       (c) The profit sharing plan was dissolved.

       (d) Sexton borrowed money to purchase assets.

8

(e) Employees were lost.

(f) The steel business was lost.

(g) Sexton Welding's customers were told that the company would be sold.

(h) Profits have been lost and are expected to be lost in the future.

(i) Money was spent.

(j) Time was lost.

(k) The business reputation of Sexton Welding has been damaged.

.

#### DISCUSSION

### I.     Breach of Contract Claim

In their Motion for Summary Judgment, plaintiffs request that the court find as a matter of law that the evidence establishes that the October 7, 1998, stock purchase offer by BOC formed a binding contract which BOC has breached. [Doc. #25].

BOC, on the other hand, asserts that the evidence establishes that there was never a binding contract entered into between the parties. It claims that the Letter of Intent states on its face that it is merely a statement of the intent of the parties and not intended to be a binding agreement. BOC states that the Letter of Intent was merely a proposal which conditioned an agreement to purchase Sexton Welding on the satisfactory completion of its due diligence investigation and the signing of a final contract, neither of which occurred. According to BOC, its due diligence investigation uncovered problems with Sexton Welding's financial condition and its cylinder inventory. As a result, it states it decided, as was its right, not to consummate the

9

deal. Plaintiffs assert that the audit performed by BOC was either a complete subterfuge or so incompetently performed as to lack any measure of good faith.

Sexton also claims that BOC suppressed material facts and committed legal fraud under §§ 6-5-100 through 6-5-104,*Code of Alabama* (1975). This cause of action is based on Sexton's claim that, before advising Sexton in mid-February 1999 that it would not complete the deal, as originally envisioned, BOC representatives knew, due to changes in the internal acquisitions policies of BOC, that BOC had become "hesitant" about completing the deal. Sexton asserts that BOC had decided as early as late November to early December 1998 not to complete the deal. Despite this, BOC, by its conduct and affirmative representations, repeatedly led plaintiffs to believe the deal would be consummated in January 1999.

Sexton further claims that BOC, by performing the due diligence investigation despite knowing it was not going to consummate the deal, caused Sexton to believe the deal was final and that, as a result, Tom Sexton dissolved Sexton Welding's employee benefit plan, lost key employees, and was forced to raise employee pay. In addition, Sexton asserts that BOC was negligent when it failed to conduct the cylinder audit and perform the verifications under the Letter of Intent in a reasonable manner and that, as a result, Sexton Welding suffered various monetary and personnel losses. It also claims that BOC acted wantonly in this regard.

BOC responds that there is no evidence to support any of these claims and requests summary judgment as to all counts asserted by plaintiffs in their complaint.

Summary judgment is appropriate only when there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c). All the evidence and all reasonable factual inferences must be drawn

10

in favor of the non-movant. *See Rayle Tech, Inc. v. DeKalb Swine Breeders, Inc.*, 133 F.3d 1405, 1409 (11th Cir. 1998). The plain language of Rule 56(c) mandates entry of summary judgment, after adequate time for discovery upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).

## Determination of the Existence of a Binding Contract

The primary matter for determination is whether there is evidence that Sexton and BOC entered into a binding contract regarding the sale of Sexton to BOC. Plaintiffs assert that the parties entered into a valid "handshake" agreement for the sale of Sexton Welding to BOC at the meeting at the Huntsville Airport restaurant on October 7, 1998. According to plaintiffs, this October 7,1998, agreement is partly written and partly oral.

According to Sexton, the written part of this agreement is that contained in the document titled "Sexton Welding Supply Company, Inc. Revised Stock Purchase Offer" and dated September 28, 1998, which contains numerous handwritten notations and amendments to the original document. [See Doc. #22, Initial Evidentiary Submissions in Support of Plaintiffs' Motion for Summary Judgment]. These changes were added during the course of oral face-to-face negotiations which occurred on October 7, 1998, at the Huntsville Airport restaurant. Sexton states that after agreeing to these changes, he stood up and shook hands with the BOC representatives and stated, "Boys, you've bought yourselves one hell of a company." Sexton asserts that this statement and these handshakes are a clear manifestation of Sexton's acceptance

11

of the offer contained in the Revised Stock Purchase Offer. Sexton also relies on an internal memorandum from BOC as evidence that BOC considered itself to have a binding deal to purchase Sexton Welding. On October 8, 1998, Peter Cochran, a BOC representative, e-mailed others at BOC stating "we got a handshake from Sexton yesterday on buying their business. Tom Sexton will announce it to his employees next week. We can then go public with the info. Bill, John, Bob, and I will start planning the integration process." According to Sexton, this evidence reflects a clear offer and acceptance culminating in an agreement on October 7, 1998.

After a review of the evidence submitted by the parties, the court concludes that the October 7, 1998, negotiations between the parties did not culminate in a binding contract for the following reasons.

The amendments to the September 28 Stock Purchase Offer made on October 7, 1998, at the restaurant meeting between the parties reflect that the parties did not consider the negotiations concluded on that date to be anything more than an "agreement to agree" on a contract to be drawn up later. There is a handwritten notation on the October 7 document which states: $300,000 to be paid at time of letter of intent signing along with Note Receivable from Tom in event he pulls out of deal." Thus, the October 7 document clearly reflects that the understanding reached on that date would be incorporated into a Letter of Intent and envisioned the possibility that the deal might not go through.

The October 7, 1998, meeting was followed up by a Letter of Intent dated October 9, 1998, sent from BOC to Sexton. That letter begins with the following statement:

12

This letter will summarize the basis of a proposed agreement for the purchase by the BOC Group, Inc. ("BOC") from Tom and Carolyn Sexton ("Selling Shareholders") of all the outstanding capital shares ("Shares") of Sexton Welding Supply Co., Inc. ("Sexton").

\* \* \*

In consideration of the sale and transfer of all outstanding Shares of Sexton, BOC will pay to the Selling Shareholders the sum of $3,857,651.00 **subject to the contingencies and adjustments as outlined below**.

[Doc. #21, Defendant's Exhibit 4] (emphasis added). The "contingencies and adjustments outlined below" included adjustments for cylinder and inventory shortages. It also included a provision for paying $300,000 to Sexton, due shortly after he signed off on the letter of intent and which was to be an amount subtracted from the total amount due if the deal was completed. In the event the deal was not completed, it was to be construed as a loan to Sexton. Clearly, such language would be unnecessary if the parties considered themselves to have entered into a binding contract with Sexton. It also should have put Sexton on notice that BOC did not consider the deal to be final.

The Letter of Intent, first drafted on October 9, 1998, also states the following:

This letter is an expression only of the present intentions of BOC, Sexton, and the Selling Shareholders and, except for paragraph 7 [Exclusive Negotiations], which is intended to be binding, imposes no obligation whatsoever upon any party. **Consummation of the transaction will be subject to satisfactory conclusion of due diligence review by BOC, and execution and delivery of a definitive purchase agreement by and among Sexton, Selling Shareholders and BOC in form and substance satisfactory to the parties and their respective counsel. This letter does not constitute a binding agreement to consummate the Transaction**

13

> **referred to herein nor does it constitute an agreement to enter into a final agreement with respect hereto.**

[*Id.*] (emphasis added). Consequently, the plain language of the Letter of Intent reflects that the terms discussed on October 7 did not form a binding contract and that one would not be formed until there was a satisfactory conclusion to the due diligence review by BOC and the execution and delivery of a definitive purchase agreement between the parties. With some minor modifications, a similar Letter of Intent, dated October 27, 1998, was signed by Sexton. Thus, he was on notice that BOC did not consider itself subject to a binding agreement. Certain modifications were made to the terms of the October 9 Letter of Intent, yet Tom Sexton never sought to amend it to remove the portion which states that these terms did not constitute a binding agreement. This reflects that Sexton was aware and acquiesced to the fact that there was no binding agreement between the parties at that point. Furthermore, by signing the document, Sexton consented to the terms contained therein.

The Letter of Intent also obligated Sexton Welding to negotiate exclusively with BOC for sixty days from the date of the execution of the Letter of Intent. However, after sixty days, the Sextons would be free to sell to any one they pleased. There would be no need for this language if the agreement was understood to be final and binding on all parties.

Plaintiffs correctly state that, under Alabama law, whether the parties have entered into a binding contract is determined by reference to the reasonable meaning of their external and objective actions. *SGB Construction Services, Inc. v. Ray Sumlin Construction Co.*, 644 So.2d 892, 894-95 (Ala. 1994). Likewise, questions of intent to enter into a binding agreement and mutual

14

assent are usually for a jury to decide. *Wadsworth House Movers, Inc. v. Salvage One Demolition, Inc.*, 474 So.2d 686 (Ala. 1985). However, there is no evidence in this case upon which a jury could reasonably find that BOC intended to enter into a binding contract on October 7, 1998. There must be some evidence of this element. Plaintiffs assert that the court should look strictly to the handshake on October 7 and the document created during the negotiations on that day and find that there was a binding contract between the parties. However, the meaning of the handshake and the document created at the October 7 meeting is, at best, ambiguous. Therefore, the determination of the existence of a contract requires that the court consider all the surrounding circumstances. *Universal Underwriters Ins. Co. v. Thompson*, 776 So.2d 81 (Ala. 2000) (if one must go beyond the four corners of the agreement in construing an ambiguous agreement, the surrounding circumstances, including the practical construction put on the language of the agreement by the parties to the agreement, are controlling in resolving the ambiguity); *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 314 (9th Cir. 1996) (handshake between the parties does not necessarily prove the existence of a contract; whether parties intended that an oral agreement be immediately effective, or only to become binding on execution of a writing, depends on the surrounding circumstances).

The October 7 document clearly contemplated that the deal might not be completed. For instance, if the parties had agreed that their discussions that day culminated in a binding contract, there would have been no need to insert a clause re-designating the $300,000 earnest money payment to Tom Sexton as a loan in the event he pulled out of the deal. Nor would it have been necessary to include the 60-day exclusive negotiations clause. The document also

15

clearly contemplated future negotiations by its reference to a Letter of Intent. If the parties had

entered into a binding contract on October 7, there would be no need for a future letter of

intent. "Every possible provision of a contemplated lease may be discussed and agreed upon,

but unless the parties intend that these discussions be binding, no contract has been formed."

*Doll v. Grand Union Co.*, 925 F.2d 1363, 1368-69 (11th Cir. 1991).

Furthermore, in August 1998, in the early stages of the negotiations, plaintiffs had been

supplied by defendant with a document titled "BOC Gases Approach to Acquisitions" which

expressly listed ten steps that the parties would follow before acquisition could be consummated:

1. Assess opportunity
2. Sign confidentiality agreement
3. Exchange preliminary information
4. Make initial offer
5. Negotiate key issues
6. Sign letter of intent (non-binding except 60-day exclusive clause)
7. Financial due diligence (2-3 days)
8. Contract preparation and review
9. Cylinder and inventory counts
10. Sale closing

[Plaintiffs' Exhibit 19]. Given this agenda, Sexton was aware, or should have been aware, that

the October 7 meeting was designed only to negotiate key issues, not enter into a final contract.

The language contained in the Letter of Intent dated October 27, 1998, and actually

signed by the parties further reflects that the October 7 agreement was not a binding contract but

simply an agreement to agree in the future. Such an agreement is not an enforceable contract.

*Rennick*, 77 F.3d at 314. In the October 27, 1998, Letter of Intent, BOC proposed to purchase

Sexton, for a sum certain, subject to certain contingencies and adjustments. These included

16

reducing the purchase price in the event of a cylinder shortage, or changes in the working capital, operating assets and other debt which was to be reflected in a closing date balance sheet prepared jointly by the parties. [Doc. #21, Defendant's Exhibit 1 at ¶1(iii)]. The Letter of Intent also contemplated adjusting the closing balance sheet by excluding resale inventories which were found by BOC to be obsolete, shopworn, or otherwise unsalable. [*Id* at ¶1(iv)]. There was also an adjustment to be made in the purchase price contingent on the successful retention of customer sales revenues. [*Id.* at ¶1(v)]. These net sales revenues were to be determined using only certain customers in sales territories currently served by Sexton Welding. However, these territories were not defined, and the Letter of Intent states: "Such territories to be defined and agreed to be (*sic*) all parties prior to closing." [*Id.*] The Letter of Intent also expressly stated that it imposes "no obligation whatsoever on any party" and that consummation was not to occur before BOC performed a due diligence review and a definitive purchase agreement was executed between the parties and delivered "in form and substance satisfactory to the parties." [*Id.*]

In *Coley v. Lang*, 339 So.2d 70, 74 (Ala.Civ.App. 1976), in a letter agreement, the stockholders and owners of an aerospace corporation agreed to sell the stock of the corporation and agreed, prior to the sale of stock, to cause the corporation to transfer all of its assets and liabilities, other than its corporate name and right to use that corporate name in foreign jurisdictions, and its corporate franchise, to a new corporation. The letter agreement also provided that on or before certain date, the letter agreement would be reduced to a definitive agreement binding upon all parties thereto and accomplishing the sale and purchase

17

contemplated by the agreement. The Alabama Supreme Court held, under these circumstances, this letter agreement was not subject to specific performance. "An agreement to enter into an agreement upon terms to be afterwards settled between the parties is a contradiction in terms, and amounts to nothing." *Id.* This case is similar to the situation that exists between BOC and Sexton Welding.

Although it is quite old, *Nicholls v. Granger*, 7 A.D. 113, 40 N.Y.S. 99 (N.Y.A.D. 1896), cited by the Alabama Supreme Court in *Coley*, also bears a remarkable resemblance to the case at bar. In that case, plaintiff and defendant, having concluded to dissolve a partnership existing between them, drew up and signed a paper by the terms of which defendant was to buy all of plaintiff's interest in the firm for a certain sum and, in addition thereto, an amount equal to one-half of the good accounts and bills receivable. Also, the accounts of the parties were to be adjusted and it was agreed that formal papers of dissolution, embodying the terms thereof, would be prepared and executed. Annexed to such formal agreement was to be a schedule showing the indebtedness of the firm, the bills, and accounts up to date; and, on delivery of such formal agreement, the consideration was to be paid over to plaintiff, either in cash or in notes, with such indorsement as would enable the plaintiff to get them discounted without recourse.

On the day fixed for signing the formal agreement, the parties met, but they did not and could not agree as to what accounts were good, or as to the adjustment of their individual accounts, and the amount of the consideration to be paid therefor could not be determined. No further agreement was executed, and a complaint subsequently was filed by the plaintiff. In

18

deciding that the document that was the subject of this dispute was not a contract, the court

stated as follows:

> It is undoubtedly true that a stipulation to reduce a valid contract
> to some other form does not affect its validity, and that although it
> is in contemplation of the parties that a more formal contract shall
> be executed, where an agreement in writing is executed by the
> parties, containing all the requirements of a valid contract, although
> the formal contract is not executed, there is a valid contract, which
> may be enforced . . . . But it is an essential to the enforcement of
> such an informal contract that the minds of the parties should meet
> upon all the terms, as well as the subject-matter, of the contract;
> and, if anything is left open for future consideration, the informal
> paper cannot form the basis of a binding contract. Applying these
> rules to the case at bar, the question is: Had the parties arrived at
> an agreement upon all the terms as well as the subject-matter? It
> is apparent that they had not. The informal agreement provided
> for the adjustment of the accounts, for the taking of the good
> accounts by one of the parties, for the making of a schedule of such
> good accounts, which was to be annexed to the formal agreement,
> and the method in which the consideration was to be paid in the
> alternative; and, if indorsed notes were offered, it is apparent that
> it was intended that the plaintiff should determine as to the
> character of the indorsement. There is nothing in the contract
> which contemplates the leaving of these things not definitely
> determined in the informal paper of August 10th to anybody but
> themselves. They were to determine as to what were good
> accounts and what were not, and it was not the intention of the
> parties that it should be left to the court or to anybody else. It is
> undoubtedly true that if a paper is intended to be a final agreement
> by the parties, and there is in it anything indefinite, which may be
> made definite by the action of the court, the court may supplement
> and make definite that which is indefinite. But where the parties
> contemplate by their own actions in a formal agreement to make
> that certain which is uncertain in an informal agreement, which is
> not intended to be the final agreement, there is nothing which the
> court has any jurisdiction to enforce.

40 N.Y.S. at 102 (citation omitted).

19

Similar to the facts in *Nicholls v. Granger*, there were several matters, as discussed above, which were to be determined and accomplished in the future either jointly by the parties or by BOC. Thus, because the understanding described in the October 7 document and memorialized in the October 27 Letter of Intent left open several key items for future consideration and agreement, it cannot form the basis of a binding contract.

The undersigned magistrate judge therefore concludes that plaintiffs have failed to establish by *prima facie* evidence that there was a mutuality of agreement as to all the essential terms. Consequently, summary judgment for defendant and against plaintiffs is appropriate for this reason alone. *Celotex v. Catrett*, 477 U.S. at 323-24, 106 S.Ct. at 2252-53.

## Statute of Frauds

However, even if a plaintiff has produced evidence of a genuine issue of material fact on matters such as the terms or existence of a contract, if the other side makes out a *prima facie* case under a special plea of the affirmative defenses of the statute of frauds or the statute of limitations, it is incumbent upon the opposite party to come forward with at least a scintilla of proof that these defenses do not apply to him. Otherwise, summary judgment is appropriate. *Hight v. Byars*, 569 So.2d 387, 389 (Ala. 1990).

The Alabama Statute of Frauds, § 8-9-2, *Code of Alabama* (1975), states that every agreement which, by its terms, is not to be performed within one year from the making thereof, is void unless it, or some note or memorandum thereof, is in writing and subscribed by the parties to be charged therewith. Likewise, every agreement for the sale or purchase of securities other than through the facilities of a national stock exchange or the over-the-counter securities market

20

also must be in writing and subscribed by the parties regardless of the time period required for performance.

As noted above, the handwritten notes on the September 28 and October 7 documents reflect that the parties anticipated a future letter of intent and contain language reflecting that the proposals made therein were not intended to be binding at that time. Thus, the evidence establishes that the October 7 document was not a memorandum of a contract entered into between the parties on that date; it is merely a document which illustrates that there were negotiations between the parties which anticipated a future contract if certain contingencies occurred. It establishes only that the parties had agreed on terms which would provide the basis for a future Letter of Intent. Thus, it is insufficient to qualify as a written contract or memorandum of same.

Furthermore, the October 7 memorandum plainly states that the parties anticipate a five-year non-competition agreement by Sexton, a five-year land lease, and the sale of stock of a closely-held corporation. Even assuming, *arguendo*, that the document produced as a result of the October 7 meeting qualifies as a "writing" or some note or memorandum thereof, pursuant to § 8-9-2, it must be subscribed to by the parties to be valid. Likewise, because the various parts of the contract are interwoven in such a way as to be inseparable, the application of the statute of frauds voids the entire contract. *Hornady v. Plaza Realty Co.*, 437 So.2d 591, 593 (Ala.Civ.App. 1983).

Plaintiffs have asserted that the presence of the BOC logo on the October 7 document can be construed as a subscription by BOC. However, the court finds the logo does not

21

substitute for subscription. Although it is possible that such a notation or letterhead could, in some circumstances, suffice as a signature, particularly under the statute of frauds provision of the Uniform Commercial Code,*see, e.g., Welch v. Mitchell*, 351 So.2d 911 (Ala.Civ.App. 1977), such alternative inscriptions are sufficient as signatures only when the party makes the inscription "for the purpose of authenticating the writing as binding on him." *Bunch v. Garner*, 208 Ala. 271, 273, 94 So. 114, 116 (1922). Where the face of the writing itself demonstrates that some further act of signing was intended, the presence of a party's letterhead on the document does not constitute a binding subscription by that party. *Durham v. Harbin*, 530 So.2d 208, 211 (Ala. 1988).

The October 7 document has a notation which states that the previously-discussed sum of $300,000 would be paid to Tom Sexton*at the time of the signing of a Letter of Intent* and he would, in turn, sign a note receivable in the event he decided to pull out of the deal. This is indisputable evidence that, on October 7, 1998, the parties anticipated a future Letter of Intent to be drafted and signed by the parties. This notation further reflects that it was anticipated that this Letter of Intent also would not be the final contract document because it provided that the $300,000 payment made to Sexton at the time of the signing of that letter would be construed as a loan if Sexton failed to go through with the deal. This demonstrates that some further act of signing was intended. Therefore, the alleged agreement violates the statute of frauds unless plaintiffs can provide a scintilla of evidence that this defense does not apply to them.

Plaintiffs assert that defendant waived a statute of frauds defense by failing to re-assert it after plaintiffs added a breach of contract claim (Count 8) in an amendment to their original

22

complaint. The amended complaint added new causes of action but did not add any new facts not previously asserted in the original complaint. Defendant asserted the statute of frauds defense in its original answer, and re-pleading it was unnecessary. In any event, defendant subsequently filed an answer to plaintiffs' amended complaint which again pled a statute of frauds defense. Although defendant's answer was late, plaintiffs likewise did not move to strike this answer until nearly four months later. In view of the fact that plaintiffs had notice that defendant was asserting a statute of frauds affirmative defense and have shown no prejudice, plaintiffs' claim is without merit.[1] See Forbus v. Sears, Roebuck & Co., 30 F.3d 1402 (11th Cir. 1994); Hassan v. U.S. Postal Service, 842 F.2d 260, 263 (11th Cir. 1988).

Based on the reasoning as set out above, plaintiffs' motion for summary judgment is due to be denied. Defendant's motion for summary judgment as to plaintiffs' claim for breach of contract is due to be granted.

## II. Fraud Claims

Plaintiffs assert that Count Two of their complaint is an action for "legal fraud" brought pursuant to §§ 6-5-101 through 104, Code of Alabama (1975). Plaintiffs deny that their action is one for "promissory fraud." The gist of plaintiffs' allegation is a claim that, in December 1998, BOC "became hesitant " about closing the deal with Sexton Welding. Plaintiffs allege that,

---

[1] Plaintiffs claim that the deposition testimony of Robert Van Kirk, taken after the establishment of the lawsuit, was a "writing" sufficient to satisfy the statute of frauds. Plaintiffs offer no Alabama authority to support this assertion. It is also illogical to assert that a contract was formed by an act which occurred after the breach is alleged to have occurred. In any event, Van Kirk denied the existence of a contract between the parties. [See Depo.. of Robert Van Kirk at 176-79). Therefore, this claim is also without merit.

23

despite this, BOC did not disclose this hesitancy and, in December 1998 and January 1999, continued to represent that the deal was going smoothly.

Plaintiffs allege also that, during this time, BOC "injected itself into virtually all aspects" of Sexton Welding's business in ways not contemplated by the Letter of Intent. This included the disclosure of proprietary information by Sexton Welding to BOC, discussions with Sexton Welding employees, and consenting to or passively allowing Sexton Welding to take actions in keeping with the Letter of Intent in order to close the transaction. Plaintiffs allege that Sexton Welding's actions at this time were based on information, actions and statements by BOC which were either untrue, recklessly communicated or would lead a reasonable person to believe that the deal would be consummated. As a result, Sexton Welding suffered the following injuries and damages:

> (a) Proprietary information was disclosed.
>
> (b) Proprietary information outside the agreement was disclosed.
>
> (c) The profit sharing plan was dissolved.
>
> (d) Sexton borrowed money to purchase assets.
>
> (e) Employees were lost.
>
> (f) The steel business was lost.
>
> (g) Sexton Welding's customers were told that the company would be sold.
>
> (h) Profits have been lost and are expected to be lost in the future.
>
> (i) Money was spent.
>
> (j) Time was lost.

24

(k) The business reputation of Sexton Welding has been damaged.

Plaintiffs also allege that these acts were intentional and willful such as to warrant punitive damages. Defendant denies these claims and asserts that it decided to pull out of the deal only after problems with Sexton Welding were discovered during its due diligence review.

In an action for fraudulent misrepresentation, there must be a (1) misrepresentation of material fact (2) concerning a material existing fact, which was (3) relied on by the plaintiffs (4) to their detriment. *Sperau v. Ford Motor Co.*, 674 So.2d 24 (Ala. 1995). "Legal fraud" includes misrepresentations of material fact made "by mistake and innocently," as well as misrepresentations made "willfully to deceive, or recklessly without knowledge."*Hughes v. Hertz Corp.*, 670 So.2d 882 (Ala. 1995). The good faith of a party in making what proves to be a material misrepresentation is immaterial as to whether there is an actionable fraud. *Goggans v. Realty Sales & Mtg.*, 675 So.2d 441 (Ala.Civ.App. 1996).

The only evidence of a misrepresentation presented by the plaintiffs is Tom Sexton's testimony that prior to February 12, 1999, he had received no indication from BOC that it did not intend to complete the deal. He further states that, on March 15, 1999, BOC representative Pete Cochran told him that he had met with the president of BOC in December and been told that BOC would not be buying Sexton Welding and that it had been necessary for him to persuade the president to go forward with the deal because BOC had given its word. Cochran also advised him that, after Brian Walsh became president of BOC, BOC had changed its approach to acquisitions. [Aff. of Tom Sexton at ¶¶128-131]. He claims that, had he been aware of these facts in December 1999, he would not have closed out his employee benefit plan,

25

would not have closed his steel sales business and would not have lost several employees.

Defendant asserts that there was no misrepresentation of any material fact upon which

plaintiffs had a right to rely. The October 27, 1998, Letter of Intent signed by the parties states:

> This letter is an expression only of the present intentions of BOC, Sexton, and the Selling Shareholders and, except for paragraph 7 [Exclusive Negotiations], which is intended to be binding, imposes no obligation whatsoever upon any party. Consummation of the transaction will be subject to satisfactory conclusion of due diligence review by BOC, and execution and delivery of a definitive purchase agreement by and among Sexton, Selling Shareholders and BOC in form and substance satisfactory to the parties and their respective counsel. This letter does not constitute a binding agreement to consummate the Transaction referred to herein nor does it constitute an agreement to enter into a final agreement with respect hereto.

[Plaintiffs' Exhibit 4]. As was discussed above, the actions of the parties on October 7, 1998, did

not result in the formation of a contract. The Letter of Intent entered into by the parties on

October 27, 1998, is clear that there existed no binding agreement between the parties.

By simply reading the Letter of Intent, which plaintiffs signed, they should have known

that the deal for the sale of Sexton Welding was not final until a final, binding agreement was

executed. Plaintiffs were fully capable of reading and understanding the Letter of Intent and,

thus, cannot show that they reasonably relied on any misrepresentation by defendant. See

*Foremost Ins. Co. v. Parham*, 693 So.2d 409 (Ala. 1997).

Further, the only "misrepresentation" made by defendant is that BOC allegedly failed to

tell Sexton in December 1998, that Cochran had to talk the then-BOC president into going

ahead with the Sexton deal after BOC supposedly had decided to back out. The fact that the

26

deal might not be consummated was contemplated in the Letter of Intent. Defendant cannot be held liable for failing to reveal to plaintiffs a fact that is plainly asserted in the Letter of Intent. Assuming that BOC changed its acquisition strategy in December 1998, to the extent that the completion of the deal became more unlikely than it was when the original Letter of Intent was signed by the parties, there is no authority for the proposition that this occurrence created an obligation requiring defendant to pass this information on to plaintiffs. BOC had no duty to tell Sexton that it was contemplating not going ahead with a deal that it had no duty to consummate in the first place. Thus, defendant cannot be held liable for "legal" fraud.

The court has found, as discussed above, that there was no contract that created any obligations between the parties. Despite plaintiffs' assertion that is not asserting "promissory fraud," this is, the only other possible basis for a claim against defendant based on fraud. To make a viable "promissory fraud" claim, plaintiffs would have to claim that BOC promised it would consummate its purchase of Sexton Welding and that, in reliance on that promise, plaintiffs took actions to their detriment. However, this also is not a viable cause of action. A fraud action based upon a promise of future performance must be based on evidence that the defendant intended to deceive the plaintiff at the time it entered into the contract. A mere statement of opinion or prediction as to events to occur in the future is not a statement of a material fact upon which individuals have the right to rely and, therefore, will not support a fraud claim. *Crowne Investments, Inc. v. Bryant*, 638 So.2d 873 (Ala. 1994).

Assuming also as true the allegation that, in December 1998, Cochran did talk the then-BOC president into going ahead with the purchase of Sexton Welding, all of the evidence reflects

27

that the decision was made at that time to continue with the purchase. [Depo. of Robert Van Kirk at 202; Depo. of Pete Cochran at 28-30]. In order for promises or opinions to constitute fraudulent misrepresentations, there must have been, at the time the representations were made, an intention not to do the act promised, and such promise or opinion must have been given with intent to deceive. *Birmingham Broadcasting Co. v. Bell,* 259 Ala. 656, 68 So.2d 314 (1953). A promise, to constitute fraud, must be made with the intent not to perform it.*Schwab v. Carter,* 226 Ala. 173, 145 So. 450 (1933). There is no evidence of this. Thus, there was no misrepresentation of any material fact by defendant and no fraud, legal or promissory in nature.

## Suppression of Material Fact

Plaintiffs also argue that defendant suppressed material facts, asserting that BOC had a duty to disclose that it had become hesitant about closing the deal with Sexton. Section 6-5-102, *Code of Alabama* (1975), provides:

> Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case.

Silence is not fraud unless an obligation to communicate a material fact exists. Such an obligation may arise where confidential relations or "particular circumstances" exist. *Trio Broadcasters, Inc. v. Ward,* 495 So.2d 621, 623 (Ala. 1986). A "confidential relationship" is defined as:

> [A relationship in which] one person occupies toward another such a position of adviser or counselor as reasonably to inspire confidence that he will act in good faith for the other's interests, or when one person has gained the confidence of another and

28

> purports to act or advise with the other's interest in mind; where
> trust and confidence are reposed by one person in another who,
> as a result, gains an influence or superiority over the other; and it
> appears when the circumstances make it certain the parties do not
> deal on equal terms, but, on the one side, there is an
> overmastering influence, or, on the other, weakness, dependence,
> or trust, justifiably reposed; in both an unfair advantage is possible.
> It arises in cases in which confidence is reposed and accepted, or
> influence acquired, and in all the variety of relations in which
> dominion may be exercised by one person over another.

*Id.* There is no evidence that a confidential relationship existed between BOC and any of the

plaintiffs. Tom Sexton has been a successful businessman for many years. There is no evidence

that he needed to rely on BOC to understand the plain language of the Letter of Intent. The

transaction between BOC and Sexton was clearly an arms-length transaction.

When the parties to a transaction deal at arm's length, with no confidential relations, no

obligation to disclose arises when, as in this case, information is not requested. *Id.* Likewise,

before an obligation to disclose can be imposed under the "particular circumstances" of a case,

the relationship existing between the parties, while not necessarily required to be confidential,

must nonetheless be such that a disclosure of material information is dictated. *Id.* As previously

stated, the parties in this case were dealing with each other at arm's length. There is no evidence

of unequal bargaining power. Because the Letter of Intent was not a binding agreement or

evidence of a binding agreement, the parties were entitled to consider not consummating this

deal. The Letter of Intent signed by the parties stated that it was the present intention of the

parties to consummate the sale, but it did not impose any obligation to do so. Because BOC had

no duty to close the deal with Sexton, it also had no duty to advise plaintiffs that a change in

29

circumstances had made it more reluctant to close the deal. In any event, the damage to Sexton Welding resulting from BOC's refusal to complete the deal is minute, if there is any at all. Sexton Welding chose to close out its employee benefit plan. It could have re-started it but chose not to. It decided to get out of the steel business but was advised that BOC was not going through with the deal before this actually occurred. Nevertheless, it chose to go ahead with the termination of that business. The real estate purchased by Tom Sexton from Sexton Welding has not resulted in any net financial loss. Tom Sexton could have sold this property back to Sexton Welding after the deal fell through but, instead, chose to lease it back to Sexton for more than the amount necessary to pay the bank loan on the purchase. The proprietary information supplied by Sexton Welding to BOC, such as names of customers, profits, losses, inventories, etc., was information BOC was entitled to in order to perform its due diligence review, and there is no evidence that BOC used this information to its advantage or to Sexton's disadvantage. "If a party refuses to be bound, yet the other changes its position in reliance on the expectation that a contract will be made, reliance on the expectation cannot turn the non-promise into a contract ... reliance must be reasonable to set up an estoppel." *Rennick*, 77 F.3d at 316.

### III.    Negligence

Plaintiffs assert also that defendant acted negligently by mis-performing the due diligence review. In particular, plaintiffs aver that BOC was negligent when it audited Sexton Welding's gas cylinders and found that there appeared to be only 6,700 cylinders, rather than the 10,307 specified in the Letter of Intent. However, Sexton Welding's own audit after the due diligence

30

review by BOC could only account for 9000 cylinders, of which 1,594 were purchased after the BOC audit. [See Defendant's Exhibit 2, Depo. of Diane Johnson at 364-65, 373-75, 443-46]. The fact that BOC came up with a different number than Sexton does not mean that it performed its count in a negligent manner. There is no evidence submitted by Sexton to demonstrate that the method used by BOC to ascertain the number of cylinders owned by Sexton was negligent. It may have been inaccurate, but this is not evidence that BOC was negligent in performing the count in that manner.

Plaintiffs also claims that BOC was negligent in its review of Sexton Welding's financial viability. This claim also is without merit. Although BOC and Sexton disagree over the actual value, profit margins, and inventory of Sexton Welding, plaintiffs have presented no evidence to show that the manner in which BOC came up with its numbers was negligent. The idea behind letters of intent and due diligence reviews is to allow a party to ascertain that it is actually buying what the other party is selling without being bound to a contract to complete the sale. If a party performing a due diligence review is subject to litigation any time the other party disagrees with its findings, the purpose behind letters of intent and due diligence reviews would be lost.

Furthermore, while Alabama law, under certain circumstances, allows a negligence claim to be based on the failure to fulfill a contractually required act, there is no contractually required act here because there is no contract. In addition, though the letter of intent reflects that a due diligence review was contemplated before a binding contract would be put together, since BOC was under no obligation to buy Sexton Welding, it was under no obligation to perform the due diligence review at all, much less in a non-negligent manner.

31

IV.    Wantonness

Since BOC had no duty to perform the due diligence review at all, it cannot have done so in a wanton manner. Further, Tom Sexton testified that he did not believe that Charlie Chastain, who conducted the cylinder audit for BOC, intentionally miscounted the cylinders, only that he seemed to be in a hurry. [Defendant's Exhibit 3, Depo. of Tom Sexton at 310-11]. There is no evidence in the record that BOC acted in a wanton manner. Therefore, this claim also must fail.

V.    Tortious Interference with Business Relationship

Plaintiffs also have failed to present evidence that BOC interfered with their business relations. They assert that BOC (1) met with all Sexton Welding employees and welcomed them to BOC; (2) offered them raises; (3) told them of the benefits of working for BOC; (4) told Sexton Welding customers BOC was buying Sexton Welding; (5) told Sexton Welding employee Steve Hasty that the steel business would not be kept; (6) caused Sexton Welding to dissolve its profit-sharing plan; and (7) caused Sexton Welding to lose valuable employees.

To establish a claim of interference with a business relationship, a plaintiff must present evidence of the following elements: (1) the existence of a contract or business relation; (2) the defendant's knowledge of the contract or business relation; (3) intentional interference by the defendant with the contract or business relation; (4) the absence of justification for the defendant's interference; and (5) damage to the plaintiff resulting from the interference. *Soap Co. v. Ecolab, Inc.*, 646 So.2d 1366, 1370-71 (Ala. 1994).

32

Meeting with Sexton Welding employees, offering them raises and telling them of the benefits of working for BOC did not result in any damage to plaintiffs, especially in view of the fact that, after the deal fell through, BOC did not attempt to hire away any employees from Sexton Welding and Sexton Welding was not bound to give raises to its employees based on BOC's promises concerning what it would be paying the employees.

Likewise, even if BOC told Sexton Welding customers that it was buying the company, Tom Sexton has admitted that none of his customers stopped doing business with him, except for Sherman Industries which did so because it was not interested in doing business with BOC. It is illogical to claim that BOC intentionally interfered with Sexton Welding's relation with Sherman because to do so meant that it intentionally ran off a future BOC customer.

In addition, there is no evidence that BOC intentionally ran off any employees of Sexton Welding. The evidence reflects that those who left did so either because they did not want to work for BOC, because they went to work for someone else, received higher compensation elsewhere, or, in the case of Steve Hasty, because he wanted to start his own business. [See Defendant's Exhibit 2, Depo. of D. Johnson at 332-334, 346-47].

Steve Hasty was Sexton Welding's employee at its Tullahoma, Tennessee location. In addition to selling Sexton Welding gas products, Hasty had set up and was operating the Sexton steel business. BOC advised Sexton and Hasty that it did not intend to operate the steel business if it took over Sexton Welding. As a result, Hasty decided that he would go into business for himself. However, before this was accomplished, BOC advised Sexton that it would not be going through with the purchase. [Id. at 322]. Despite this, Hasty decided to continue with his plan

33

to start his own business and Sexton Welding decided to continue with its plan to discontinue its steel business.

Finally, all of the actions taken by BOC were undertaken in relation to the due diligence review. Sexton Welding acquiesced in this review when it signed the letter of intent. It cannot claim interference with its business relations when it agreed to the conduct of the review. To hold otherwise could result in litigation any time a due diligence review resulted in a party refusing to consummate a deal. This would be contrary to the purpose of entering into a letters of intent in the first place. A defendant cannot be found liable for interference simply by exercising its legal rights. See *Mann v. Bank of Tallassee*, 694 So.2d 1375, 1384 (Ala.Civ.App. 1996).

## VI.    Individual Claims of Tom Sexton and Carolyn Sexton

In addition to the reasons cited above for dismissing the claims asserted by Tom and Carolyn Sexton in their individual capacities, the law is well-settled in Alabama that "when the harm or damage for which a plaintiff seeks recovery are incidental to his or her status as a stockholder in a corporation, the claim is a derivative one and must be brought on behalf of the corporation." *General Motors Corporation v. Bell*, 714 So.2d 268, 290 (Ala. 1996) (citing*Pegram v. Hebding*, 667 So. 2d 696 (Ala. 1995)). Each of plaintiffs' counts allege actions taken by BOC in relation to its proposed purchase of Sexton Welding.

34

## CONCLUSION

Based on the reasoning outlined above, the undersigned finds that plaintiffs have failed to establish a *prima facie* case of the existence of a contract for the sale of Sexton Welding to BOC. The court also finds that plaintiffs have failed to establish that BOC committed acts of negligence, wantonness, or interference with Sexton Welding's business relationships. Therefore, plaintiffs' motion for summary judgment is due to be denied. Defendant's motion for summary judgment is due to be granted with respect to all claims asserted by plaintiffs. A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this 19th day of June, 2001.

HARWELL E. DAVIS, III
UNITED STATES MAGISTRATE JUDGE

35